BETTY JEANNE CLAFFEY HOYT

*v.*

HENRY KORB HOYT.

372 S.W. 2d 300

(*Nashville,* December Term, 1962.)

Opinion filed November 6, 1963.

118

MONTEDONICO, BOONE, GILLILAND, HEISKELL & LOCH, Memphis, JOHN R. GILLILAND, Memphis, of counsel, for appellant.

LAUGHLIN, WATSON, CRESON, GARTHRIGHT & HALLE, Memphis, LARRY CRESON and JAMES L. GARTHRIGHT, JR., Memphis, of counsel, for appellee.

Mr. Justice Dyer delivered the opinion of the Court.

Appellant, Jeanne Claffey Hoyt, and Appellee, Henry Korb Hoyt, were married June 21, 1956. In February 1961 Appellant filed a divorce action the result being the parties entered into a written agreement dated May 12, 1961 effecting a reconciliation and dismissal of this divorce action.

This agreement of May 12th, which is in question here, recites, "Whereas, said parties desire to effectuate a reconciliation, terminate said separation and resume cohabitation as man and wife. * * *," and that the parties desire to settle all property rights arising out of their marriage, and any future action for divorce or separation, certain mutual promises are made. By the terms of the agreement, Appellee agrees to resume cohabitation and promises to sell certain property held jointly by the parties. The proceeds of the sale are to become the sole property of Appellant and if the proceeds are less than $45,000.00 Appellee is to pay Appellant the difference. Appellee also covenants to provide a specified amount monthly for household expenses and Appellant's support in addition to other sundry obligations.

Appellant agrees to resume cohabitation and dismiss her pending divorce suit. Further she agrees to accept

the property settlement above in complete satisfaction of all claims, against the joint estate or Appellee's separate estate, arising out of their marriage, the reconciliation and any subsequent action for divorce or separation. Appellee also expressly waives all rights to any present or future alimony and support, and agrees that in the event either party files for divorce this agreement is to constitute the property settlement. In such a case Appellee's sole responsibility is to be the support of the parties' minor child.

Pursuant to their mutual promises, the Appellant and Appellee resumed cohabitation. Appellant received her $45,000.00, at least one monthly payment, and she in turn dismissed her pending divorce suit.

The reconciliation was short lived and on December 29, 1961 Appellee filed his original bill in the cause now before the Court seeking an absolute divorce from Appellant. Appellant filed an answer and cross-bill seeking a divorce, alimony and child support. To such parts of the cross-bill as sought to question the validity, enforcibility and binding effectiveness of the agreement entered into by these parties on May 12, 1961 the Appellant filed a demurrer. The Chancellor sustained the demurrer and allowed a discretionary appeal to this Court.

The question here for determination is whether the written agreement entered into by these parties on May 12, 1961 is valid and bars any right of Appellant to be awarded reasonable alimony and support from Appellee under her cross-bill.

Appellant attacks this contract on the ground it is against public policy and void, and in support of this position cites the case of *Copeland v. Boaz*, 68 Tenn. 223

decided by this Court in 1877. In this case the husband, while separated from his wife, had executed a note to a trustee for the wife to induce her to return. In a suit against the husband on the note this Court said:

"The relation of husband and wife was in nothing changed by the separation. All the obligations, moral and legal, still rested upon them. The parties could not and did not by the separation diminish or enlarge their respective rights and duties under the law regulating the relation of husband and wife.

"The most that can be made of the undertaking here will not carry it above the grade of an executory contract. A promise by the husband to pay to the wife, or to another for the benefit of the wife, without more is nudum pactum. The undertaking contravenes public policy, is primitive of separation of husband and wife, and not tolerable in law."

Appellant insists the case at bar is controlled by the Copeland case. Although the Copeland case is difficult of interpretation since we do not know just what the court meant by the words, "without more," nevertheless the court does not hold such agreements are promotive of separation of husband and wife and therefore not tolerable in law. We agree if this case is to control the case at bar, Appellant is correct.

Other courts have reached the same conclusion as reached by this Court in *Copeland v. Boaz,* supra for various reasons. In *Miller v. Miller,* 78 Iowa 177, 35 N.W. 464, 42 N.W. 641 (1889), the Iowa court reasoned that reconciliation agreements were against public policy, because it would disrupt domestic life if there was an attempt to enforce it. Similarly, *Mathie v. Mathie,*

12 Utah 2d 116, 363 P.2d 779 (1961), recognized that reconciliation agreements may become a method by which one party seeks to bargain himself into an advantageous position by using family strife. This bears the seeds of future dissension, and tends to encourage the marriage partners to avoid or abrogate their marital duties which are set by law.

The Texas court in *McKay v. McKay,* 189 S.W. 520 (Tex.Civ.App.1916), thought somewhat along the same lines as this court did in *Copeland v. Boaz,* supra, when it said it objected to one party having to bargain for the resumption of his marital rights to which the law already says he is entitled.

Less pragmatic courts object to any type of antenuptial or post-nuptial agreements, because they think these agreements tend to cheapen the marriage concept. This theory apparently is that in a sense one party is buying his marriage partner, and this degrades the character of the marriage relationship.

Despite the preceding, a majority of courts say that reconciliation agreements are favored by law, and they are not against public policy. See generally, Nelson, Divorce and Annulment, sec. 1330 (2d ed. 1945); Lindey, Separation Agreements and Ante-Nuptial Contracts, Part Three, sec. NN at 534 (1937); 11 A.L.R. 277 (1921).

The cases which hold that reconciliation agreements are not against public policy generally reason that these agreements tend to promote and stabilize the marriage relationship. *Tyson v. Tyson,* 61 Ariz. 329, 149 P.2d 674 (1944); Cf. *Mathie v. Mathie,* supra; 11 A.L.R. 277 (1921). A representative statement of the reasoning of

this position is found in *Upton v. Ames & Webb, Inc.,* 179 Va. 219, 18 S.E.2d 290 (1942), where the Court says:

"It would be a curious policy which would forbid a husband or wife who has filed a well-founded cross-suit for divorce from making a contract with the other spouse which would operate to prevent a severance of their marital relations." 18 S.E.2d at 293.

■ The stability of the home founded on the union of man and woman through marriage has from the beginning been of such great importance to the public good, that the courts have long held void, as against the public interest, any contract of any nature, which would be promotive or conducive to the breaking up of this relation. This reasoning is as valid in this modern age as it has ever been. We think the correct decision in the case at bar will be reached by deciding whether or not a contract of this nature would be promotive or conducive to the breaking up of the marriage relation.

In the case of *Home Beneficial Association v. White,* 180 Tenn. 585, 177 S.W.2d 545 this Court in regard to determining public policy of the State said:

"In the case of the *Nashville Ry. & Light Co. v. Lawson,* 144 Tenn. 78, 87, et seq., 229 S.W. 741, this Court discussed at length, and with the citation of many authorities, the grounds upon which a contract may and may not be held void as violative of public policy. From that discussion, it seems clear that the public policy of the State is to be found in its Constitution, its laws, its judicial decisions and the applicable rules of common law. 'Public Policy' is practically synonymous with 'public good,' and unless the private contract is in terms of such a character as to tend to harm

or injure the public good, public interest or public welfare, or to violate the letter or the spirit of the Constitution, laws, common and statutory, or judicial decisions of the State, it is not violative of public policy nor void on that account.

" 'The meaning of the phrase "public policy" is vague and variable; courts have not defined it, and there is no fixed rule * * * to determine what contracts are repugnant to it. The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests. It is only because of the dominant public interest that one who, like respondent, has had the benefit of performance by the other party will be permitted to avoid his own promise.' "

In determining whether this contract is void as being in violation of public policy it is proper to consider the situation of the parties at the time the contract was made and the purposes of the contract. *Lippman v. Boals,* 79 Tenn. 489; *Sanders v. Sanders,* 40 Tenn.App. 20, 288 S.W.2d 473, 57 A.L.R.2d 932.

We have a husband and wife, mature in age, each having been previously married, each having children from previous marriages, who have now reached the point in their own marriage where the wife has a divorce action pending against the husband. Under such circumstances these parties, each represented by counsel, have begun negotiations to the end this contract was executed, which had the apparent present intention of effecting a reconciliation of the parties. It is apparent from the contract property was one of the principal

causes of friction between the parties, and by this contract they attempted to settle this matter between themselves for the present and the future.

■ Antenuptial property settlements are favored by public policy. *Key v. Collins,* 145 Tenn. 106, 236 S.W. 3; *Sanders v. Sanders,* 40 Tenn.App. 20, 288 S.W.2d 473, 57 A.L.R.2d 932. Since such is the case, then if this agreement had been executed by these parties prior to their marriage it would not have been subject to attack on the ground of violation of public policy.

■ A marriage settlement, if free from collusion, entered into by husband and wife in contemplation of divorce is not against public policy. *Killebrew v. Killebrew,* 24 Tenn.App. 24, 137 S.W.2d 953. Then if this agreement had been entered into by these parties contemplating a divorce it would have been free from attack as being against public policy.

Since the above two propositions of law are correct, then by what reasoning does it become a violation of public policy for a husband and wife, upon finding their marriage breaking up with property one of the causes, to then try to save their marriage by entering into a property settlement, even though this property settlement be binding not only at the time of its execution but also in the future.

There have been changes in the laws of this state since the decision in *Copeland v. Boaz,* supra, (1877), which changes though not directly in point, as such, on the issue raised here, nevertheless they do bear weight with the Court in deciding whether this contract is in violation of the public policy of this state. At the time of the Copeland decision most of the rights, duties and disabili-

ties of the marriage relation were fixed by the common law. Under the common law theory of marriage husband and wife became one person and under this theory it would be impossible for them to contract with each other, although equity has long recognized the separate existence of the wife with respect to her separate equitable estate.

The legislature by Chapter 26, Public Acts of 1913 now carried as Section 36-601, T.C.A., enacted a statute contravening the common law, which statute in effect fully emancipates a married woman in regard to her property and right to contract. See cases annotated in T.C.A. after this code section. While this statute has no effect on the conjugal relationship with its duties and rights, it does, as stated above, bear weight on the issue in this cause.

We think and so hold this contract, in the absence of fraud or other vitiating circumstances, entered into by Appellant and Appellee to settle their property rights is not promotive or conducive of the separation of the parties and therefore not in violation of the public policy of the State.

The Appellant attacks the present agreement upon a more specific public policy basis. She contends the agreement is invalid because its provisions necessarily contemplate a possible future separation or divorce. Several provisions of the agreement do in fact provide that in the event of a future separation or divorce the terms of the agreement will govern.

The cases of *Russell v. Russell,* 3 Tenn.App. 232 (1926) and *Carroll v. Springer,* 14 Tenn.App. 195 (1931) are cited by the Appellant as controlling on this question.

These cases recognize the rule that separation agreements are illegal if they provide for a possible separation in the future. See also 17A Am.Jur. Divorce and Separation, Sec. 889 (1957) and 17 C.J.S. Contracts sec. 235b (1963) for other cases supporting this view. The reason generally assigned is that such agreements tend to induce separations.

■ ■ Several considerations lead us to believe the above authority is not controlling here. The purpose of a contract is important in the consideration of whether or not it violates public policy. *Lippman v. Boals,* 79 Tenn. 489 (1883). We do not see why this principle should not apply here. In applying this principle we note the above cases concern separation agreements, but the present case involves a reconciliation which is diametrically opposed. The purpose of a reconciliation agreement, everything else being equal, is to bring the parties together, and allusions to further separations are secondary. Such provisions may be important in circumstances indicating fraud or overreaching, but generally their effect would be incidental and we do not think controlling.

■ ■ Furthermore, bona fide agreements relating to alimony or the adjustment of property rights between husband and wife, though in contemplation of divorce or separation, but not directly conducive to the same, are valid. Lindey, Separation Agreements and Ante-Nuptial Contracts, Part one, Sec. B at 49 (1937) ; Nelson, Divorce and Annulment, Sec. 13.23 at 505 (2d ed. 1945). Although a marital agreement may in some manner contemplate a divorce or separation, the test of its validity is whether or not the contract is collusive. *Killebrew v. Killebrew,*

24 Tenn.App. 24, 137 S.W.2d 953 (1939); *Bailey v. Bailey,* 6 Tenn.App. 272 (1927). The agreement also would naturally be invalid if there were elements of fraud other than collusion.

There are as yet no findings of fact in this suit, but there are allegations of fraud, non-disclosure and over-reaching. If these allegations are substantiated the agreement may be vitiated. Also if the agreement was entered into for the reason of inducing a separation it could be avoided. Until such allegations are proven, and upon the basis of the foregoing we cannot say as an abstract principle of law that this agreement is invalid because it provides for the possibility of a future separation or divorce.

Appellant attacks this contract alleging her agreement to discontinue the separation and return to live with Appellee cannot constitute a sufficient consideration for an agreement on the part of Appellee to pay her for so doing, since in returning to live with him she only performed the duties contemplated by the marriage. If mutuality is lacking then Appellant is correct, but in this case we have the complicating factor that Appellant has received a substantial benefit from Appellee in the form of $45,000.00 under the terms of this contract.

The authorities are uniform in holding that where there has been full or substantial performance by one party to a bilateral contract, originally invalid for want of mutuality of obligation, the other party cannot refuse performance after receiving the promised benefits. 1 Williston sec. 106; 1 Corbin on Contracts sec. 143; 17 C.J.S. Contracts sec. 100(3); 12 Am.Jur., Contracts sec. 114, 6 R.C.L. Contracts, sec. 96 (1915). These authori-

ties, while arriving at the same result, are not in agreement as to their theories.

Williston and Corbin contend that once performance is made of the counterpromise (Appellee's here) the other promise (Appellant's promise) becomes binding as sufficient consideration has been received for it. By this view a binding unilateral contract is forged out of a former, invalid bilateral contract.

The other authorities indicate that the theory to be applied is that of estoppel. 31 C.J.S. Estoppel sec. 110a; 19 Am.Jur., Estoppel, sec. 64; 6 R.C.L., Contracts, sec. 96.

In the case of *Frierson v. International Agricultural Corporation,* 24 Tenn.App. 616, 148 S.W.2d 27 (1940) the court made the following statement:

"[L]ack of mutuality cannot be made available for annulment of a contract if the consideration, whether of money or performance, has been paid or performed; or where there has been a substantial performance by the opposite party; or where there has been performance subsequent to the execution of the instrument." 24 Tenn.App. at 616, 148 S.W.2d at 38.

■ Appellant is estopped from questioning the validity of this contract on the ground of lack of mutuality. See *Wilson v. Wilson,* 23 Tenn.App. 244, 130 S.W.2d 140 (1939); *Edgewood Lumber Co. v. Hull,* 32 Tenn.App. 577, 223 S.W.2d 210 (1949); *Wyatt v. Brown,* 39 Tenn.App. 28, 281 S.W.2d 64 (1955).

The decree of the Chancellor in sustaining the demurrer filed by Appellee to such parts of the cross-bill filed by Appellant which seek to question the validity of this contract is affirmed.

The case of *Copeland v. Boaz*, 68 Tenn. 223, wherein same is necessarily in conflict with this opinion, is overruled.

The cause is remanded for further proceedings not inconsistent with this opinion.